UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

Michael S. Kimm, Esq. (MK4476)
KIMM LAW FIRM
333 Sylvan Avenue, Suite 106
Englewood Cliffs, New Jersey 07632
T: 201-569-2880
*Attorneys for Plaintiff*

| | |
|---|---|
| LOIS CHUN,<br><br>　　　　　Plaintiff,<br>　vs.<br><br>SUSHI MARU EXPRESS CORP., SUSHI NARA, KOMOLO, INC., and KEVIN KIM,<br><br>　　　　　Defendants. | 17-CV-_____<br><br>**Complaint for FLSA and NJS Labor and CEPA Violations, With Jury Demand** |

Plaintiff Lois Chun (Chun), states upon knowledge except where stated upon information and belief:

## THE PARTIES

1. At all relevant times, Plaintiff Chun was and is an individual who is a domiciliary and resident of New Jersey and resides in Demarest, New Jersey.

2. At all relevant times defendant Sushi Maru Express was and is a business entity believed to be organized under New Jersey law with its principal place of business at 65 Challenger Blvd., #202, Ridgefield, New Jersey. At all relevant times,

1

defendant Sushi Maru Express was and still is engaged in the business of operating a food service business specializing in Japanese sushi products.

3. At all relevant times defendant Sushi Nara was and is a business entity believed to be organized under New Jersey law with its principal place of business at 65 Challenger Blvd., #202, Ridgefield, New Jersey. At all relevant times, defendant Sushi Nara was and still is engaged in the business of operating a food service business specializing in Japanese sushi products.

4. At all relevant times defendant Komolo, Inc. was and is a business entity believed to be organized under Maryland law with a business address at 6630 Amberton Drive, #C, Elkridge, MD 21075. At all relevant times, defendant Komolo was and still is engaged in the business of supplying sushi supplies to the other defendants and its operations and finances are commingled with the other entity defendants so as to yield the highest profitability to Komolo. Because defendant Komolo is a co-venturer of Sushi Maru and is essential in the success or failure of any specific location or the overall business concept, this defendant is an employer as the term is understood by plaintiff.

5. At all relevant times defendant Kevin Kim was and is an individual who is believed to be an officer, director, shareholder or otherwise responsible person who managed labor affairs on behalf of Sushi Maru Express and Sushi Nara and maintains

an office at 65 Challenger Blvd., #202, Ridgefield, New Jersey.

6. The foregoing defendants were "employers" of plaintiff within the meaning of the applicable statutes and case law as defendants suffered plaintiff to work, as more-fully stated below.

## JURISDICTION AND VENUE

7. The Court has jurisdiction over this action as it arises under federal law under 28 U.S.C. §§ 1331, 1337 and 29 U.S.C. 216(b), as it implicates the Fair Labor Standards Act. State claims are appropriate under the supplemental jurisdiction statute 28 U.S.C. § 1367. Venue is proper under 28 U.S.C. Section § 1391(1), (2) because substantial events or omissions occurred in this district and defendants transact business in this district or within the State of New Jersey.

## BACKGROUND

8. Plaintiff is a graduate of Le Cordon Blue, Austin, Texas, with a degree in Culinary Arts. Plaintiff was an employee of defendants, from approximately April 8, 2016 to September 30, 2016. When plaintiff was hired, defendants operated approximately 100 Sushi Maru locations, with approximately 20 more impending openings, and defendants had future plans of expansion from there as well.

9. Sushi Maru operates a sushi counter (or, as defendants call it, "a sushi corner") inside a supermarket or specialty market under a profit-sharing agreement

with the operator of the supermarket or specialty market.  Sushi Nara is essentially the same as Sushi Maru but "Nara" is installed in a location which is "too close" to another location of "Maru" such that the pre-existing location might result in a "conflict," so as to "have the cake and eat it too."  Komolo is the supplier of all sushi supplies, all containers and all non-fish supplies such as garnishments.

10. Plaintiff was hired as a "Marketing Employee" who was to be in charge of the then-future marketing direction of the Maru-Nara-Komolo combination of entities towards the next "chapter" of their development but was not permitted to conduct marketing tasks.  Plaintiff was offered a weekly salary of $690.00 for working 35 hours a week plus an hour for paid lunch.  Plaintiff was to be provided with full medical insurance promptly after her hiring was completed.  The medical insurance was to replace plaintiff's then-existing policy.  Plaintiff was also offered a yearly vacation allowance.  Plaintiff accepted these terms and began to work immediately.

11.  Within one week of commencing the work as "Marketing Employee," plaintiff was told that there was not much marketing work at that time and that she would be expected to do other things.  In fact, the "Marketing Employee" position was abandoned and the defendant-employers, by and through defendant Kevin Kim, the "big boss," directed plaintiff to handle "odds and ends" that were responsibilities of hourly paid workers at various Sushi Maru locations.  Defendants precluded

plaintiff from working "marketing tasks" and, recognizing that plaintiff was fluent in English, defendant Kevin Kim directed her to "address" sanitary code violations being raised by supermarket co-venturers as to the unsanitariness of Sushi Maru's practices.

12.  Defendants engaged in a long list of sanitary code violations, both under the State code, local codes and the U.S. Food and Drug Administration regulations.  The Food, Drug & Cosmetics Act, codified at Title 21.  Among these, various measures of protection that apply to food safety and food transportation requirements, the FDCA provides:

A. Section 331 prohibits (a) any adulterated or misbranded food, drug, device, tobacco product, or cosmetic.

B. Section 342 prohibits "adulterated food" including poisonous, insanitary or adulterated ingredients.

C.  Section 123.5(a) mandates that the facilities, methods, practices and controls used to process fish and fishery products are safe and processed under sanitary conditions.

D. Section 110.35 mandates (a) that general buildings and plants be kept in such condition and repair as to prevent food from becoming adulterated within the meaning of the Act and (b) cleaning substances be in compliance with sanitary and

safety standards. Subsection (c) mandates pest control standards. Subsection (d) mandates that all food-contact surfaces be sanitary both under wet and when dry conditions. And subsection (e) mandates storage of cleaned and sanitized portable equipment.

E. Section 110.80(a) requires sanitary standards for receiving, inspecting, transporting, segregating, preparing, manufacturing, packaging and storing food products under adequate, sanitary procedures. This section mandates "raw materials" be handled in certain ways so as to avoid contamination including (1) inspecting and segregating those materials to verify that the raw materials are contaminated; (2) pasteurizing or otherwise preventing them from becoming infected with microorganisms; (3) preventing toxins from adulterating raw materials; (4) preventing microorganisms from contaminating or adulterating the raw materials; (5) keeping raw materials in bulk in containers so as to prevent adulteration; (6) keeping frozen raw materials in frozen state and thawing in a manner that prevents adulteration; (7) protecting liquid raw materials from contamination.

F. Section 110.80(b) requires that manufacturing operations adhere to sanitary practices to prevent contamination and unsanitary conditions.

G. Section 123.12, specifically relating to imported fish products, requires (a) detailed importation and importer-of-record records and (b) detailed third-party

6

importer/agency records concerning sanitary practices.

13. Defendants routinely ordered their workers to mishandle food materials, raw materials, and fish and fishery products in such a way as to be in violation of one or more of the laws and regulations governing the food safety requirements under the FDCA. Among the violations:

A. Defendants routinely used refrigerators (not freezers) before its own untrained, unsanitary staff re-packed the "frozen" fish; disregarded moisture buildup in the refrigerator; then placed the thawed or thawing fish in freezers, so as to create bacterial icing, in blatant disregard of proper vacuum packaging and freezing of raw fish supplies so as to maintain minimal sanitary, anti-bacterial conditions. By such actions, defendant Komolo permitted and cultivated bacteria growth and bacteria preservation within the "vacuum packs" due to the moisture build that occurred in the refrigerator.

B. Defendants re-branded fish that was bought "dirt cheap" as "premium" fish supplies and represented to the supermarket and specialty market joint venturer partners as Sushi Maru or Sushi Nara using only "premium" fish supplies for their customers, quite falsely. During the process of re-branding the fish, they routinely handled such fish without minimal anti-contamination measures.

C. The supermarkets and specialty markets generally failed to audit the

standards and did not inspect the facilities of Komolo or defendants' fish handling practices.

    D.  Komolo employees were not properly trained in the handling of raw food products.  They routinely dumped bulk fish packs from frozen trucks onto the warehouse floor; divided the fish in smaller batches while they thawed; then separated them into smaller units while they thawed; then re-packed them into smaller units for re-pricing and re-distribution to the numerous Sushi Maru or Sushi Express counter locations and presented them as "premium fish."

    E.  Sushi Maru "corner" employees, some of whom were investor-employees, were not properly trained or educated in food handling.  For example, one or more sushi chef was seen by plaintiff as going inside his pants and scratching his crotch; only to return to making sushi products that had been ordered by a consumer, without observing minimal sanitary standards.

    F.  Sushi Maru and Sushi Nara employees routinely mishandle raw fish supplies; routinely fail to keep them properly refrigerated or frozen until the supplies are to be used and routinely place the customers in peril of bacterial poisoning after consuming unsanitary sushi products.

    G.  When raw fish supplies are received, reduced oxygen packaging (ROP), also known informally as vacuum packaging faility, is required.  This requires a

zoning variance and HACCP plan (Hazard Analysis Critical Control Point). Not having these protocols, especially the ROP capability, the raw fish supples were mishandled. Mishandling included the failure to store fish at a proper temperature. In this regard, salmon and tuna are required frozen at different temperatures using different procedures. Defendants stored salmon along with tuna and disregarded the fish-specific temperature requirements.

    H.  Defendant Komolo represented to the consumers and to the supermarket operators that salmon was "Atlantic salmon" and "Norwegian salmon" but in fact the salmon is from the "cheapest" markets and sold as "premium, Atlantic salmon" and "premium, Norwegian salmon."

    I.  Defendant Komolo used the same delivery and packing pallet (a square wooden support) where frozen, refrigerated and dry goods were lumped together, then wrapped with vinyl wrapping and handled as a single item rather than treating each category of product (frozen, refrigerated, dry, etc.) as separate types of products and thereby violated the food safety laws and regulations.

    J.  Defendant Komolo failed to have proper facilities for raw fish which required state-of-the-art time and temperature controls. All fish supplies were to have been delivered frozen (shrimp, filet tuna, chopped tuna) but some frozen items were sent for delivery in non-frozen truck or in refrigerated truck.

K. Defendant Komolo bought bulk fish that came delivered in large trash bags or styrofoam boxes; then defendants' warehouse employees mishandled these fish supplies by dividing them in the open into smaller units to be sold and distributed to various Sushi Maru locations. Komolo's delivery to local Sushi Maru "corners" often consisted of improperly re-packaged fish supplies which had icicles, or were delivered in open, trash bags, or in other form.

L. Sushi Maru and Sushi Nara locations routinely used equipment and appliances on site that were for home use rather than for commercial use. These included rice cookers, rice containers, toaster ovens, rice-mixing bowls, and cutting boards.

M. Sushi chefs and other food handlers routinely failed to attend food preparation seminars required by local health departments and routinely failed to check for the hepatitis virus in case of any injury or cuts in the work place.

14. In addition to federal food safety laws and regulations, local food safety laws and regulations were routinely violated by essentially the kinds of conduct stated above. In New York City, where defendants operate a significant number of locations, Article 81 of the New York City laws, which prohibit essentially the same kinds of violations as stated above, have been violated.

15. On numerous occasions, virtually since the first month of her being on the

job with defendants, plaintiff reported to upper management about such unsanitary and unlawful practices and warned the officers and companies that they required immediate, remedial and compliance actions. Initially, the upper level management received plaintiff's reports constructively but, as plaintiff's reports became more frequent and alarming, defendants began to cut plaintiff off from the chain of communication and eventually began to treat her like a paranoid hypochondriac and disregarded her verbal reports about unsanitary and unlawful food preparation and food handling and food storage and transportation practices.

16. By August 2016, plaintiff was so mistreated by upper management that she could no longer feel wanted or suited at the workplace and she was targeted for scorn and ridicule, and routinely treated as an "crazy woman."

17. Defendants thus retaliated against her attempts to call the corporate officers' attention to the extensive, long, numerous food safety violations that were ongoing and flagrant at the operations of Komolo and numerous Sushi Maru locations. Wherever she visited, she observed informal, untrained workers engaging disgusting practices. Retaliatory actions against her grew worse to a point where she was forced to stop going to work.

18. Despite the fact that defendants knew that she had been effectively terminated from employment, they refused to acknowledge this fact and refused to

write a letter of verification that she was no longer working for them.

## CLAIMS FOR RELIEF

### Count One – FLSA Wage and Hour Violations

19. The foregoing paragraphs are incorporated by reference.

20. From the second week of work, plaintiff was out of status and became a wage earner. Even worse, plaintiff's work hours were not 35 hours or 40 hours; defendants unilaterally increased plaintiff's hours to routinely up to 90 hours a week. Defendants directed plaintiff to "make rounds" through various locations and essentially "clean up" at locations where the supermarket operators had been complaining to defendants that the "sushi corner" had been unsanitary. Plaintiff was denied lawful wage and hour benefits including overtime; denied the medical insurance that was promised; and denied other applicable benefits.

21. During the course of her employment, defendants have failed to provide accurate, weekly breakdowns of the hours worked, wages earned, overtime hours earned. Defendants failed to keep Plaintiff's and other employees' work hours from the moment they began activities that benefitted the employer until they were no longer so engaged. The aggregate of such times was approximately 12-15 hours per day, six days a week, every weekend, at least partially.

22. Defendants are engaged in activities in or affecting interstate commerce,

and each is generating yearly revenues well in excess of the $500,000 requirement under the applicable statute. Upon information and belief, defendants generate approximately $20,000,000 yearly revenues.

23. Due to defendants' violations, Plaintiff has sustained wage and overtime losses. Defendants paid a "weekly salary" for all hours worked by Plaintiff, in violation of Plaintiff's right to be paid an hourly rate of pay plus overtime pay for all hours worked in excess of 40 hours per week.

24. Plaintiff was not executive, professional or otherwise exempt from the wage and hour laws. In essence Plaintiff was a "kitchen cleanup staff" whose time was controlled by defendants, as her employers, while plaintiff was a wage earner hired by pretense of a grandeur work assignment.

25. Defendants have been or are still involved in similar wage and hour suits including these:

    A.    <u>Beck v. Sushi Maru Express, et al</u>., Case Number 2:14-cv-03488-SDW-SCM, in the U.S. District Court for the District of New Jersey at Newark (involving one Plaintiff; settled after class/collective certification was denied without prejudice pending discovery);

    B. <u>Ham et al v. Sushi Maru Express et al</u>., Case Number 1:15-cv-06138-FB-JO, in the U.S. District Court for the Eastern District of New York

(involving two Plaintiffs; settled while motion for class/collective certification was pending, following limited collective action discovery);

        C.    <u>Choi et al v. Sushi Maru Express et al.</u>, Case Number 1:17-cv-00191-LTS, in the U.S. District Court for the Southern District of New York (putative class/collective action brought by one named plaintiff).

26.  Defendants and each of them have been unjustly enriched at plaintiff's expense because of their policy of underpaying the employees by paying a purported lump sum "salary" regardless of the total "hours worked" and the "regular rate of pay"; under-counting the hours worked; and deliberately failing to keep wage and hour records; failing to provide weekly review/accounting of wages earned; and failing to pay employer contributions of social security tax and other benefits.

27.  By reason of the foregoing, defendants being the employer and supervisor, owner, manager, or other person of responsibility of Plaintiff, committed one or more violations of the federal wage and hour laws by deliberately underpaying Plaintiff:

        A.    failure to pay proper overtime wages;

        B.    failure to pay lunch hour wages;

        C.    failure to pay the employer contribution to social security and other benefits;

        D.    failure to keep proper wage and hour records;

  E. failure to pay for medical insurance.

## Count Two – State Labor Law Wage and Hour Violations

28. The foregoing paragraphs are incorporated by reference.

29. By reason of the foregoing, defendants have violated the New Jersey State Labor Law and in particular the wage and hour provisions by failing to pay proper wages, proper overtime, spread of hours, and by failing to provide proper documentation and accounting of employees' wages and hours.

30. Due to defendants' violations, each Plaintiff and others who are similarly situated have sustained losses while defendants-employers have unjustly benefitted from the unfair wage payment practices.

## Count Two – Failure to Make Proper Employer
## Contribution to Social Security and Other Benefits

31. The foregoing paragraphs are incorporated by reference.

32. Defendants failed to make employer contributions to each employee's social security benefit and other benefits to which each employee was entitled at the relevant times.

## Count Three – Failure to Keep Proper Records

33. The foregoing paragraphs are incorporated by reference.

34. Defendants failed to keep proper record of each employee's work hours and

lunch hours and other intervals of the work day which was spent on behalf of the employer(s).

## Count Five – NJ CEPA Violation

35. The foregoing paragraphs are incorporated by reference.

36. During May, June, July, August and September 2016, on numerous occasions plaintiff specifically told defendants, through defendant Kevin Kim, that the widespread and pervasive unsanitary practices were believed by her to be in violation of health codes, health and safety regulations, and legal violations; and each time she did so defendant Kevin Kim told her to "shut up." Towards the end of her short employment with defendants, defendant repeatedly expressed frustration that plaintiff was not "going along" with things and that plaintiff was disruptive to the business plans. Ultimately, defendant Kevin Kim cited to certain "Internet blog" pages where plaintiff had been cast in a false light by anonymous posters; and defendant Kevin Kim told her that she was being terminated because she was a "criminal." By such action, defendants retaliated against her because she reported to Kevin Kim the serious, pervasive, ongoing violations of the health code, and health and safety regulations and laws by defendants and their improperly-trained workers and as defendants believed or knew that such conduct was going to be reported to the supermarkets or to government agencies.

...

37. The <u>New Jersey Conscientious Employee Protection Act</u> prohibits an employer's "retaliatory action" against an employee because the employee engages in any one of the following activities:

> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes:
>
>> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . .; or
>>
>> (2) is fraudulent or criminal . . .;
>
> . . . .
>
> c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
>> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . .;
>>
>> (2) is fraudulent or criminal . . .; or
>>
>> (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

<u>N.J.S.A.</u> 34:19-3.

38. The statutory language of N.J.S.A. 34:19-2(e) defines "retaliatory action" as a "discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment."

39. Plaintiff reasonably believed that her employer's conduct was violating a local health code, a state health code, and/or a federal food safety regulation promulgated by the U.S. FDA pursuant to law. In addition, plaintiff performed whistle-blowing activity described in N.J.S.A. 34:19-3a, c(1) or c(2); (3); defendants took an adverse employment action against plaintiff; and a causal connection exists between the whistle-blowing activity and the adverse employment action.

40. Because plaintiff was hired as "Marketing Manager" and was rendered out of status by directing her to work as "kitchen support staff," reporting the sanitary code violations and regulatory violations were not part of plaintiff's duties and therefore she engaged in protected whistle-blowing activity.

## Count Six – Defamation

41. The foregoing paragraphs are incorporated by reference.

42. In September 2016, after plaintiff reported to defendants, through defendant Kevin Kim, events that were believed to be health code violations, defendant Kevin Kim told plaintiff that she was no longer required. He manufactured and uttered a pretextual excuse for termination. Defendant Kevin Kim told plaintiff and others that plaintiff was "criminal." By such action, defendants and each of them committed defamation per se.

### Count Seven – Retaliation for Worker's Compensation Request

43. The foregoing paragraphs are incorporated by reference.

44. Several weeks before she was ultimately terminated, plaintiff suffered an accident and was injured while on the job. She thus requested workers' compensation insurance benefits so as to obtain treatment and related benefits. Defendants, principally by defendant Kim, told plaintiff that she injured herself; that if she were to seek workers' compensation insurance benefits, she would be terminated and her work record would be smeared so that she would be unable to seek another job.

45. Defendants threatened plaintiff against exercising her statutory right to seek remedy for becoming injured on the job. Defendants threatened to retaliate and suppressed plaintiff's ability to seek statutorily guaranteed rights.

46. Upon information and belief, defendants did not maintain adequate workers' compensation insurance; failed to provide coverage for plaintiff; failed to report her on-the-job injury so as to avoid premium increases; or deliberately failed to provide her with access to such workers' compensation benefits out of bad faith and thereby deprived her of such benefits.

47. Defendants' ultimately termination of plaintiff was, in substantial part, motivated by retaliatory intentions as described above.

WHEREFORE, Plaintiff demands for himself and all others who are similarly

situated on whose behalf this action is brought, judgment against the defendants, as follows:

    A. granting compensatory damages for unpaid wages and benefits,

    B. granting compensatory damages for other claims;

    C. granting punitive damages and liquidated damages;

    D. granting pre-judgment and post-judgment interest;

    E. granting legal fees; other professional fees; costs; and

    F.  any other relief the Court deems just and proper under the circumstances.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury.


Dated: August 25, 2017                        <u>/s/ Michael S. Kimm</u>
                                              Michael S. Kimm
                                              KIMM LAW FIRM
                                              *Attorneys for Plaintiff*